IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Terry Shumpert Bailey, | ) | C/A No.: 1:14-1643-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)(1) (D.S.C.), and the order of the Honorable R. Bryan Harwell dated October 2, 2014, referring this matter for disposition. [ECF No. 15]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 14].

Plaintiff filed this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On July 12, 2007, Plaintiff filed an application for DIB in which she alleged her disability began on August 31, 2000. Tr. at 98, 139–41. Her application was denied initially and upon reconsideration. Tr. at 100–01, 107–08. On December 21, 2009, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Walter C. Herin, Jr. Tr. at 24–78 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 22, 2010, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–23. On July 2, 2010, the Appeals Council denied Plaintiff's request for review. Tr. at 1–4. Then-United States Magistrate Judge Bruce H. Hendricks ("Judge Hendricks") issued an order on November 22, 2011, reversing the Commissioner's decision and remanding the claim under sentence four of 42 U.S.C. § 405(g). Tr. at 561–71. The Appeals Council issued an order remanding the case to the ALJ on September 21, 2012. Tr. at 572–74. On March 5, 2013, Plaintiff had a second hearing before ALJ Herin. Tr. at 460–540 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 5, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 439–59. On February 5, 2014, the Appeals Council declined to assume jurisdiction, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 428–32. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 24, 2014. [ECF No. 1].[1]

---

[1] Although this action was not commenced within 60 days from the date of the Commissioner's final decision, the record indicates that the Appeals Council's February 5, 2014, letter was returned to the Appeals Council and mailed to Plaintiff's counsel on

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 42 years old at the time of the first hearing. Tr. at 31. She completed high school. Tr. at 32. Her past relevant work ("PRW") was as a cashier, a cook, and a waitress. Tr. at 530–31. She alleges she has been unable to work since August 31, 2000. Tr. at 139. Plaintiff's date last insured ("DLI")[2] for DIB was December 31, 2005. Tr. at 98.

2.    Medical History

a.    Prior to DLI

Plaintiff was hospitalized at Palmetto Richland Memorial Hospital in January 1999, after reportedly jumping out of a truck traveling at approximately 30 miles per hour. Tr. at 263. Scott B. Boyd, M.D., noted a CT scan showed "a left temporofrontal, slim, subdural hematoma measuring approximately 5 mm." *Id.* Dr. Boyd also noted a left temporofrontal contusion, a slight subarachnoid hemorrhage, and a right parietal scalp hematoma. *Id.*

Plaintiff followed up with Dr. Boyd on February 23, 1999. Tr. at 217. She complained of headaches and anxiety, which were indicated to be premorbid problems. *Id.* Plaintiff also indicated she felt fatigued and intellectually slow, but her mother stated

---

March 5, 2014. Tr. at 422. In light of this evidence in the record, the undersigned construes the action to have been commenced within 60 days after the mailing to Plaintiff of the notice of the decision and therefore, timely filed under 42 U.S.C. § 405(g).

[2] According to the Social Security Administration's Program Operations Manual Systems ("POMS"), the DLI is "the last day in the last quarter when disability insured status is met." POMS RS 00301.148. Individuals over age 31 must have at least 20 quarters of coverage over a 40-quarter period, ending with the quarter in which the waiting period begins, to be insured for DIB. POMS RS 00301.120.

Plaintiff was close to her baseline. *Id.* Dr. Boyd suggested Plaintiff had "a fairly classic post-concussive syndrome," but would get better with time. *Id.*

On March 24, 2000, Plaintiff complained of insomnia and headaches to her physician at Pelion Family Practice. Tr. at 239. The examiner noted no significant observations and refilled Plaintiff's medications. *Id.*

On September 29, 2000, Plaintiff presented to Pelion Family Practice complaining of left elbow pain and back pain. Tr. at 238. She indicated she was lifting boxes the day before and her back was very sore. *Id.* She also complained of pain and tingling from her left elbow to her left shoulder as a result of repetitive arm motion. *Id.* Plaintiff was tender to palpation in her lower lumbar area. *Id.* She also had positive straight leg raise bilaterally at 20 degrees. *Id.* She was tender at the lateral epicondyle of her left arm. *Id.* Her provider diagnosed epicondylitis and back pain and prescribed a 10-day supply of Arthrotec to be taken twice daily, 30 Soma pills to be taken up to three times daily, and 45 Darvocet N 100 to be taken up to three times daily. *Id.*

On February 28, 2001, Plaintiff reported to her provider at Pelion Family Practice that her anxiety was well-controlled on Xanax. Tr. at 237.

On January 18, 2002, Plaintiff followed up at Pelion Family Practice for hypertension and asthma. Tr. at 235. Plaintiff's diagnoses included uncontrolled hypertension, asthma, and generalized anxiety. *Id.*

A treatment note from Pelion Family Practice dated July 21, 2003, indicates Plaintiff's chronic problems included hypertension, COPD/asthma, anxiety, and increased lipids. Tr. at 213.

Laboratory testing dated September 17, 2003, indicated elevated total cholesterol, triglycerides, and LDL cholesterol. Tr. at 222.

On January 2, 2004, Plaintiff reported to her physician at Pelion Family Practice that she took Soma for chronic back spasms and Xanax because she was "too hyper." Tr. at 248. Her physician refilled prescriptions for Soma, Xanax, and Lipitor. *Id.*

A treatment note from Pelion Family Practice dated March 16, 2004, notes Plaintiff had been seeing Ms. Craig for transient muscle spasms in her back and complained of "back pain on the right flank that seems to radiate down the lateral portion of her right leg." Tr. at 248. Plaintiff indicated the back pain was likely "from lifting furniture this past weekend." *Id.* Upon physical examination, Plaintiff demonstrated minor muscle spasms, tenderness over the lateral portion of the spine at L2 to L5, and an associated paraspinal muscle spasm on the side. *Id.* However, straight leg raise, cross leg raise, and Patrick's test were negative, and Plaintiff had normal strength and range of motion in her lower extremities. *Id.* Plaintiff's prescriptions for Soma and Xanax were refilled and her prescription for Lotensin HCT was increased. *Id.*

On July 1, 2004, Plaintiff underwent a pelvic ultrasound after complaining of right lower quadrant pain. Tr. at 215. The test indicated no abnormalities. *Id.*

Plaintiff completed a health profile at Lexington Family Practice on July 28, 2004. Tr. at 806–07. She indicated she was taking Lipitor and Lotensin once daily and Xanax and Soma three times daily. Tr. at 806. She denied being employed, indicated she slept for eight hours per night, endorsed walking to obtain some exercise, and noted her recreational activity or hobby was "taking care of grandma." *Id.* Plaintiff checked boxes

to indicate frequent problems with swollen and stiff joints, serious back trouble, and arthritis. Tr. at 807.

On August 3, 2004, Plaintiff presented to William Dacus, M.D. ("Dr. Dacus"), complaining of fungus and an ingrown toenail. Tr. at 344. Dr. Dacus removed the toenail and instructed Plaintiff to follow up as needed. *Id.*

On October 21, 2004, Plaintiff followed up with Dr. Dacus to obtain medication refills. Tr. at 342. Dr. Dacus prescribed Lipitor and Lotensin. Tr. at 343.

Plaintiff complained to Dr. Dacus of "mildly worse" low back pain during her annual physical on April 27. 2005. Tr. at 339. Dr. Dacus noted no abnormalities during the physical examination, but he prescribed Soma 350 mg to be taken at bedtime and provided two refills. Tr. at 341.

On May 3, 2005, Plaintiff presented to Dr. Dacus complaining of back pain that radiated to her buttocks. Tr. at 337. She indicated the pain was "constant, severe, and throbbing." *Id.* Dr. Dacus stated "[t]his is an acute episode with no prior history of back pain," and Plaintiff indicated that the pain started when she fell two days earlier. *Id.* Plaintiff had some tenderness in her spine, but Dr. Dacus observed no other abnormalities. *Id.* Dr. Dacus prescribed Anaprox DS 550 mg, twice daily with two refills and Lortab 10/500 mg, every four to six hours with no refills. Tr. at 338.

Plaintiff presented to David Lyle, M.D., complaining of an ingrown toenail on November 18, 2005. Tr. at 334. Her physical examination was normal. *Id.* Dr. Lyle refilled Plaintiff's prescription for Soma 350 mg to be taken at bedtime and provided two refills. Tr. at 336.

b.      After DLI

On January 19, 2006, Plaintiff complained to Dr. Dacus of constant, severe, and throbbing back pain that radiated to her buttocks. Tr. at 333. Dr. Dacus indicated "[t]his is a chronic, but intermittent problem with an acute exacerbation." *Id.* Plaintiff stated her current exacerbation of pain began two days earlier. *Id.* Aside from some tenderness in Plaintiff's lumbar spine, the physical examination was normal. *Id.*

An MRI of Plaintiff's lumbar spine on March 10, 2006, revealed degenerative disc disease and severe disc space narrowing and desiccation at L5-S1, associated with a focal right paracentral disc protrusion. Tr. at 297. Radiologist John H. Haynes, M.D., noted the right paracentral disc protrusion "only minimally effaces the right anterolateral margin of the thecal sac and does not obviously exert traction or displace either proximal nerve root," and based his conclusion on an absence of right S1 radiculopathy. *Id.*

On Wednesday, April 5, 2006, Plaintiff presented to Ezra B. Riber, M.D., for initial consultation regarding low back pain. Tr. at 303. Plaintiff indicated to Dr. Riber that her back pain had begun approximately a year earlier, when she fell on ice and landed on her back. *Id.* Plaintiff complained of paresthesias in both lower extremities and over both lateral hips. *Id.* She indicated her pain was exacerbated by prolonged sitting or standing. *Id.* Dr. Riber indicated he had reviewed Plaintiff's MRI, and that she had a "reasonably good looking lumbar spine" but for "the L5-S1 disc which is significantly degenerated." *Id.* Upon examination, Plaintiff demonstrated limited range of motion; discomfort with forward flexion greater than 40 degrees, extension past 10 degrees, and bilateral lateral flexion generally; tenderness over both greater trochanters; and positive

straight leg raise bilaterally. *Id.* Plaintiff's gait and station were unremarkable and she was able to stand on her heels and toes. *Id.* Dr. Riber provided diagnostic impressions that included bilateral lumbar radicular syndrome, chronic and intractable back pain, bilateral paresthesias of the lower extremities, and bilateral trochanteric bursitis. Dr. Riber recommended L5-S1 epidural steroid injection and prescribed Valium 10 mg. Tr. at 304. Dr. Riber administered an L5-S1 interlaminar epidural steroid injection and a bilateral sub-bursal trochanteric injection and performed an epidurogram procedure on May 4, 2006. Tr. at 305, 306. He repeated the procedures on September 19, 2006, and February 6, 2007. Tr. at 307–10.

Plaintiff followed up with Dr. Dacus to discuss medication for her back pain on May 11, 2006. Tr. at 332. She indicated she was experiencing an exacerbation of back pain that began two days earlier and that her pain was constant and severe and was throbbing and radiating to her buttocks. *Id.* Dr. Dacus observed tenderness in Plaintiff's left lumbar paraspinal muscles, but the examination was otherwise normal. *Id.*

On May 18, 2006, Plaintiff presented to Dr. Dacus with increased bruising and lower limb edema. Tr. at 330. She indicated the bruises had been present for four days and the swelling had been present for several weeks. *Id.* Dr. Dacus ordered several blood tests. *Id.*

On August 15, 2006, Plaintiff indicated to Dr. Dacus that her prescription for Oxycontin 80 mg, twice daily was not adequately controlling her low back pain. Tr. at 326. She requested additional medication to be taken between doses of Oxycontin. *Id.* Plaintiff described her pain as "constant, severe, and throbbing." Dr. Dacus noted "[t]his

is a chronic, but intermittent problem with an acute exacerbation." Plaintiff exhibited tenderness in her left lumbar paraspinal muscles, but her examination was otherwise normal. Tr. at 326. Dr. Dacus prescribed OxyIR 5 mg capsules to be taken every four to six hours as needed for pain. Tr. at 327.

Plaintiff presented to Dr. Dacus for an annual examination on September 15, 2006. Tr. at 323. Chronic low back pain was noted in Plaintiff's medical history, but her musculoskeletal exam revealed normal range of motion, strength, and tone, and her neurological examination was also normal. Tr. at 323–24.

Plaintiff followed up with Dr. Dacus on December 7, 2006. Tr. at 321. Plaintiff's low back pain was "stable" and she communicated no other complaints. *Id.* Her examination was normal. *Id.*

On February 28, 2007, Plaintiff presented to Dr. Dacus for medication refills. Tr. at 319. Plaintiff's back pain was "stable" and she had no new relevant complaints. *Id.*

Plaintiff followed up with Dr. Dacus on May 25, 2007, for medication refills. Tr. at 317. Plaintiff's low back was stable, and she tolerated all of her medications well. *Id.*

Plaintiff complained of low back pain to Dr. Dacus on August 14, 2007, and indicated she was no longer able to see Dr. Riber because his office did not accept her insurance. Tr. at 316. Dr. Dacus noted bilateral lumbar and sacral paraspinous muscle tenderness, brisk femoral pulse, intact reflexes, full active and passive range of motion, and negative bilateral straight leg raise. *Id.*

Plaintiff complained to Dr. Dacus of constant, severe low back pain that radiated to her buttocks on September 4, 2007. Tr. at 315. She indicated she experienced

numbness in her upper arms, forearm, buttocks, thighs, lower leg, and foot. *Id.* She noted her pain worsened with back flexion and twisting. *Id.*

State agency medical consultant Ellen Humphries, M.D., completed a physical residual functional capacity assessment on October 5, 2007, in which she indicated Plaintiff had the following limitations prior to her DLI: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. Tr. at 347–53.

On December 11, 2007, Plaintiff reported to Dr. Dacus that she fell four days earlier and was experiencing a "flare up of back pain." Tr. at 375. Dr. Dacus described Plaintiff's pain as being in the lower lumbar spine and radiating to the buttocks. *Id.* He indicated it was "chronic problem, with essentially constant pain." *Id.* Plaintiff also complained of lower extremity edema, but Dr. Dacus noted no swelling or abnormalities aside from tenderness in Plaintiff's lumbar spine. *Id.*

On January 11, 2008, state agency consultant Manhal Wieland, Ph.D., indicated the record contained insufficient evidence to complete a psychiatric review technique for the period prior to Plaintiff's DLI. Tr. at 356, 368.

Plaintiff complained to Dr. Dacus of low back pain associated with radiation to the buttocks and numbness in the upper arms, forearms, buttocks, thigh, lower leg, and foot on January 30, 2008. Tr. at 377. Dr. Dacus noted tenderness in Plaintiff's lumbar spine, but no other abnormalities. *Id.*

On February 26, 2008, Plaintiff informed Dr. Dacus she was taking a lot of medication for breakthrough pain, and Dr. Dacus noted that the pain had "a detrimental impact on mood, self esteem and sleep." Tr. at 379. Plaintiff described her pain as a seven out of 10. *Id.* Dr. Dacus observed muscle tenderness, but no other abnormalities upon physical examination. *Id.* He increased Plaintiff's pain medication dosage. *Id.*

During an office visit on May 20, 2008, Dr. Dacus noted Plaintiff continued to complain of constant low back pain, but she was "walking daily." Tr. at 381. Dr. Dacus observed muscle tenderness, but noted no other abnormalities. Tr. at 382.

On September 8, 2008, Plaintiff complained of upper back pain and "black and blue areas." Tr. at 389. Dr. Dacus observed tenderness in Plaintiff's lumbar and cervical areas and referred Plaintiff for an x-ray of her cervical spine. *Id.*

Plaintiff reported increased low back pain on October 31, 2008. Tr. at 391. Plaintiff informed Dr. Dacus that her current medications were not controlling her pain and that she was taking more medication than she was prescribed. *Id.* She complained of severe pain that was lasting for a majority of the day. *Id.* Dr. Dacus prescribed Lortab 10/500 mg to be taken every four to six hours as needed and Neurontin 600 mg to be taken three times daily. *Id.*

On December 1, 2008, Plaintiff's low back pain was described as "stable and nonprogressive," but she complained of pain in her upper thoracic spine and into her neck and shoulders. Tr. at 392. She also complained of swelling in her lower legs. *Id.* Dr. Dacus refilled Plaintiff's prescriptions for Neurontin 600 mg, MS Contin 60 mg, Fluoxetine 20 mg, Lasix 20 mg, Lipitor 40 mg, Lisinopril/Hydrochlorothiazide 20/12.5

mg, and Lovaza 100 mg. Tr. at 393. He also prescribed Zanaflex 4 mg, every six to eight hours as needed and Morphine Sulfate 30 mg, every six hours as needed. *Id.*

Plaintiff followed up with Dr. Dacus for thoracic and lumbar pain on January 13, 2009, February 23, 2009, and March 23, 2009. Tr. at 395, 397, 399. On March 23, 2009, Dr. Dacus noted "[t]he pain has a detrimental impact on concentration, mentation and sleep." Tr. at 399. He described Plaintiff's low back pain as "severe" and "worsening." Tr. at 400.

On April 20, 2009, May 18, 2009, and July 10, 2009, Dr. Dacus indicated Plaintiff's low back pain and quality of life were "stable." Tr. at 401, 403, 408. Plaintiff complained primarily of upper back pain on May 18, 2009, and June 15, 2009. Tr. at 403, 405.

On July 26, 2009, Plaintiff presented to Gregory J. Konduros, M.D. ("Dr. Konduros"), after sustaining a fall. Tr. at 410. She complained of worsened left leg radicular symptoms. *Id.* Dr. Konduros observed Plaintiff to have left-greater-than-right paralumbar tenderness at L4 to S1, mildly positive straight leg raise on the left with full extension, and a slight limp. *Id.* He prescribed MS Contin 30 mg for breakthrough pain and instructed Plaintiff to follow up with Dr. Dacus. *Id.*

Plaintiff followed up with Dr. Dacus on July 30, 2009, complaining of right hip pain and numbness in her legs. Tr. at 411. She complained of pain at the right greater trochanter and in the right gluteal region, and Dr. Dacus observed limited active range of motion. Tr. at 411–12.

Dr. Dacus completed an impairment questionnaire form on September 4, 2009. Tr. at 372–74. He indicated Plaintiff could sit for about four hours and stand/walk for less than 2 hours total in an eight-hour day. Tr. at 372. He specified Plaintiff could walk for one city block without rest. *Id.* He indicated Plaintiff could both sit and stand for one hour at a time before needing to change positions. *Id.* He noted Plaintiff could rarely twist, stoop (bend), crouch/squat, and climb stairs. Tr. at 373. Dr. Dacus indicated Plaintiff could never climb ladders. *Id.* He stated she could frequently lift and carry 10 pounds or less, could occasionally lift and carry 20 pounds, but could never carry 50 pounds. *Id.* He indicated Plaintiff's experience of pain or other symptoms was frequently severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* He estimated Plaintiff would be absent from work more than four days per month as a result of her impairments or treatment. *Id.* He suggested Plaintiff was unable to sit for six hours out of an eight-hour workday and was unable to stand for six hours out of an eight-hour workday. *Id.* Dr. Dacus indicated Plaintiff's chronic back pain and anxiety disorder were disabling and prevented her from engaging in sustained employment in a competitive work environment. Tr. at 374. Finally, he submitted that Plaintiff had been disabled since at least December 31, 2005. *Id.*

Plaintiff continued to complain of low back pain and associated numbness and to receive medication refills at monthly follow up visits with Dr. Dacus between November 27, 2009 and January 10, 2013. Tr. at 702, 704, 706, 708, 710, 712, 715, 717, 719, 721, 723, 725, 727, 729, 736, 738, 740, 742, 744, 746, 749, 751, 753. 755, 757, 759, 763, 766, 768, 770, 772, 774, 776, 778, 780, 782, 793, 796, 799, 802.

The Social Security Administration referred Plaintiff for a comprehensive orthopedic examination with James F. Bethea, M.D. ("Dr. Bethea"), on October 18, 2012. Tr. at 692–93. Plaintiff informed Dr. Bethea that she had experienced lower back pain for years and that it was never better than an eight out of 10. Tr. at 692. She indicated her abilities to walk and sit were both limited to 10 minutes at a time. *Id.* She stated she could lift a gallon of milk. *Id.* Dr. Bethea noted Plaintiff weighed 293 pounds and was five feet, seven inches tall. Tr. at 693. Plaintiff was unable to tandem walk or walk on her toes, but she could walk on her heels. *Id.* She had limited range of motion of her lumbar spine with flexion at 70 of a possible 90 degrees and extension at 20 of a possible 25 degrees. Tr. at 700. However, Plaintiff's straight leg raise test was negative. Tr. at 693. Dr. Bethea reviewed Plaintiff's 2006 MRI of the lumbar spine and indicated an impression of lumbar degenerative disc disease. *Id.* He recommended she obtain a new MRI. *Id.* Dr. Bethea completed a medical source statement of ability to do work-related activities in which he indicated Plaintiff could frequently lift and carry up to 10 pounds and occasionally lift and carry 11 to 20 pounds; sit for 1 hour at a time; stand for one hour at a time; walk for one hour at a time; sit for three hours in an eight-hour workday; stand for three hours in an eight-hour workday; walk for three hours in an eight-hour workday; frequently reach overhead; continually reach in all other directions, handle, finger, feel, and push/pull; continuously operate foot controls; occasionally climb stairs and ramps and balance; never climb ladders or scaffolds, stoop, kneel, crouch, or crawl; never be exposed to unprotected heights or vibration; and occasionally operate a motor vehicle. Tr. at 698. Dr.

Bethea indicated Plaintiff was unable to walk a block at a reasonable pace on rough or uneven surfaces. Tr. at 699.

On November 26, 2012, Dr. Dacus wrote a letter to Plaintiff's attorney in which he indicated he believed Plaintiff continued to have the same limitations and restrictions noted in the questionnaire dated September 4, 2009. Tr. at 790. Dr. Dacus discussed evidence that supported his opinion that Plaintiff had been disabled from working since at least December 31, 2005, including his records, records from Pelion Family Practice, and the x-ray and MRI performed in 2006. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    December 21, 2009

At the hearing on December 21, 2009, Plaintiff testified that she lived with her husband and 17-year-old daughter. Tr. at 31–32. She acknowledged being left-handed and stated she was five feet, seven inches tall and weighed 255 pounds. Tr. at 33. She indicated she had a driver's license and drove for approximately 45 minutes to attend the hearing. Tr. at 34.

Plaintiff stated she typically drove two to three times per week and most frequently visited the grocery store about a mile from her home. *Id.* She testified she also drove to visit Dr. Dacus once per month, to her mother's home, and to church. Tr. at 35. Plaintiff indicated she could bathe and dress herself and go to the bathroom without assistance. *Id.* She stated she prepared some meals for herself and her family and did

some of the grocery shopping. Tr. at 35–36. She testified that her daughter performed most of the laundry and other household chores. Tr. at 36.

Plaintiff testified she last worked around November 2000 as a cashier and cook. Tr. at 37. She stated she stopped working because she was experiencing pain in her back and swelling in her feet and legs. *Id.* She indicated she worked at Waffle House as a cashier, cook, and server from 1996 to 1999. Tr. at 37–38. She testified that she previously worked as a cashier at Pit Stop for about a year. Tr. at 38. She indicated she worked for the highway patrol as an administrative specialist for six years before working at Pit Stop. *Id.*

Plaintiff testified she had back pain and numbness when standing or sitting for long periods. Tr. at 40. She indicated the pain from her back radiated through her arms and legs. Tr. at 41. She stated she was prescribed Lasix in 2005 for daily swelling in her legs and feet. *Id.*, Tr. at 45. She also endorsed pain, swelling, and numbness in her shoulders and elbows. *Id.* Plaintiff testified that she had carpal tunnel release surgeries performed on both of her hands when she was working at Waffle House. Tr. at 42. She indicated she frequently experienced numbness in her arms and hands while lying down at night. Tr. at 43. Plaintiff stated she sustained a closed head injury in 1999 and continued to have headaches and memory problems as a result of the injury. Tr. at 46. She indicated she took medications for hypertension, hypercholesterolemia, acid reflux, and insomnia. Tr. at 46–47. She also stated that Dr. Dacus diagnosed her with anxiety for which he prescribed Xanax. Tr. at 49. Plaintiff testified that she took two 60-mg Morphine Sulfate pills every 12 hours and an additional 30-mg Morphine Sulfate pill

every six hours for breakthrough pain. Tr. at 50. She indicated Morphine Sulfate caused drowsiness and stated she would not take it when driving. *Id.*

When Plaintiff's attorney asked Plaintiff what was the heaviest thing she had lifted in the last five years, Plaintiff stated "my grandson." Tr. at 51. She indicated he likely weighed about 25 pounds when she last lifted him. Tr. at 52. Plaintiff complained of pain when bending. *Id.* She stated she could stand for 10 to 15 minutes at a time. *Id.* Plaintiff testified she could sit for a maximum of one hour at a time. Tr. at 53. She indicated she could walk for "no more than a block" before experiencing pain. *Id.*

Plaintiff testified she generally awoke between 9:00 and 10:00 a.m. and went to bed around 11:00 p.m. Tr. at 62–63. She indicated she typically spent her days alternating between lying on her sofa and sitting in a chair, watching television and movies, and preparing food for herself. Tr. at 63.

ii.     March 5, 2013

At the hearing on March 5, 2013, Plaintiff testified she lived with her husband to whom she had been married since 1982. Tr. at 470–71. She indicated she weighed 300 pounds. Tr. at 471.

Plaintiff stated she typically drove to the store once a week. Tr. at 473. She indicated that, in 2005, she sometimes required her husband's assistance when dressing. Tr. at 473–74. She stated she did not need assistance with bathing in 2005, but sometimes needed help when going to the bathroom. Plaintiff testified she did not prepare meals for her family in 2005, but she could heat food in the microwave and prepare sandwiches. Tr.

at 476. She denied performing any household chores in 2005 and stated her husband and daughter performed all of them. Tr. at 477.

The ALJ read to Plaintiff the records for the period from August 2004 through December 2006. Tr. at 478–92. He asked Plaintiff about Dr. Dacus's May 3, 2005, treatment note. Tr. at 481. Plaintiff indicated her neighbor's dog knocked her over, causing her to injure her back. Tr. at 482.

Plaintiff's counsel examined her regarding a questionnaire she completed when she established treatment with Dr. Dacus. Tr. at 495–96. Plaintiff acknowledged she had indicated she had serious back problems, arthritis, and that her joints were frequently painful, swollen, or stiff. *Id.* Plaintiff stated she received additional treatment for her back pain, including referral to a pain management physician and stronger medications, after obtaining an MRI in 2006. Tr. at 497. She indicated she was having the same problems in 2005 that she was having when she had the MRI performed in 2006. Tr. at 499. Plaintiff testified that she treated exclusively with Dr. Dacus since her husband was laid off from his job and they lost their insurance. Tr. at 500.

Plaintiff's attorney questioned Plaintiff regarding an absence of reference to back problems in some of Dr. Dacus's records. Tr. at 501. Plaintiff stated she had initially suspected that she was experiencing "female problems," but had later concluded the problems were related to her back when she continued to experience them after having outpatient gynecological surgery. *Id.*

Plaintiff testified she was unable to work in 2004 and 2005 because of the medications she was taking and because she was unable to "stay up for so long" as a

result of pain. Tr. at 502. The ALJ questioned Plaintiff regarding her medications. *Id.* He pointed out that she was directed to take Soma at night and that her other medications were not indicated to cause drowsiness. Tr. at 502–03. Plaintiff maintained that Soma prevented her from working. Tr. at 506.

Plaintiff testified that, in 2005, her back pain prevented her from returning to any of the work she had performed in the past. Tr. at 510. She indicated that, in 2005, she could have stood for 10 to 15 minutes at most during an eight-hour day. Tr. at 512. She then expressed some confusion over the question. *Id.* Her attorney rephrased the question, and Plaintiff indicated that she was incapable of performing a job that required her to stand for six hours out of an eight-hour day or a job that required her to sit for six hours out of an eight-hour day in 2005. Tr. at 512–13.

The ALJ questioned Plaintiff regarding the questionnaire she completed at Dr. Dacus's office in 2004. Tr. at 515. He pointed out that Plaintiff indicated she took care of her grandmother and walked for exercise. *Id.* Then, he asked her how long she could walk during that time. Tr. at 516. Plaintiff responded she could walk "probably just enough to go to the bathroom." Tr. at 517. The ALJ pointed out the inconsistency between her response and her indication in the 2004 questionnaire that she walked for exercise. *Id.* Plaintiff then responded that she walked to and from her grandmother's trailer in 2005, which was less than 100 yards from her home. Tr. at 517–18. The ALJ asked her how long she could sit during the relevant period. Tr. at 518. She stated she could only sit for 15 to 20 minutes at a time because of numbness and muscle spasms. Tr. at 518–19. Plaintiff testified she could lift nothing heavier than a five-pound bag of sugar

during the relevant period. Tr. at 519. Plaintiff indicated no physician placed specific limitations on her activity during the relevant period. *Id.*

After Plaintiff completed her testimony, the ALJ informed her that her husband, who was testifying as a witness would need to sit where she had been sitting. Tr. at 520. The ALJ stated "[y]ou have been sitting in that chair now for an hour and 15 minutes; I'm sure you probably want to stand up." *Id.*

b.    Witness Testimony

At the hearing on March 5, 2013, Plaintiff's husband Billy Ray Bailey ("Mr. Bailey") testified as a witness. Tr. at 520–28. Mr. Bailey stated that he and Plaintiff were married on March 28, 1982, and lived together at all times since they were married. Tr. at 521–22. He indicated he performed "a job or two every week" or "every other week," but did not maintain regular employment. Tr. at 522. He denied having a driver's license and stated he had not had one in "well over 10 years." *Id.* Mr. Bailey stated Plaintiff experienced back pain prior to 2005. Tr. at 523. He indicated Plaintiff also noticed pain and numbness in her legs. Tr. at 524.

Mr. Bailey testified that he started performing household chores to assist his wife approximately 12 years earlier. *Id.* He stated Plaintiff's condition had deteriorated and she had been able to do less and less over time. *Id.* Mr. Bailey indicated his daughter performed most of the household chores in 2005. Tr. at 525. He stated Plaintiff tried to wash dishes in 2005, but had to lean against the sink and "finally" had to "go sit down." *Id.* Mr. Bailey testified that, during the relevant period, he typically had to help Plaintiff to use the bathroom once daily because she was experiencing cramps. Tr. at 526–27. He

stated he had to assist Plaintiff in climbing stairs and the ramp at their home. Tr. at 527–28. Mr. Bailey indicated he added a wheelchair ramp to his home in 2003 or 2004. Tr. at 528. He stated Plaintiff needed assistance in getting out of the car since around 2001. *Id.*

### c.    Vocational Expert Testimony

#### i.    December 21, 2009

Vocational Expert ("VE") Joel Leonard reviewed the record and testified at the hearing on December 21, 2009. Tr. at 64–74. The VE categorized Plaintiff's PRW as a waitress, *Dictionary of Occupational Titles* ("*DOT*") number 311.477-034, as light and semiskilled with a specific vocational preparation ("SVP") of four; a short order cook, *DOT* number 313.374-014, as light and semiskilled with a SVP of three; and a sales clerk, *DOT* number 290.477-014, as light and semiskilled with a SVP of three. Tr. at 67.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift no more than 50 pounds occasionally and 25 pounds frequently. Tr. at 68. The VE testified that the restriction would not preclude the hypothetical individual from performing any of Plaintiff's PRW. *Id.*

The ALJ described a second hypothetical individual of Plaintiff's vocational profile who could lift no more than 20 pounds occasionally and 10 pounds frequently; could stoop, twist, crouch, kneel, climb stairs and ramps, crawl, and balance no more than occasionally; and could not climb ladders, ropes, or scaffolds. Tr. at 68. The ALJ asked if those restrictions would allow for the performance of Plaintiff's PRW. Tr. at 68–69. The VE testified that the restrictions would allow for performance of Plaintiff's PRW as a cashier and a sales clerk with approximately 15,000 jobs statewide and approximately

one million jobs nationally. Tr. at 69–70. He also indicated that the hypothetical individual could perform the job of hotel clerk, *DOT* number 238.367-038, with 3,400 jobs in South Carolina and 250,000 jobs nationally, which utilized transferable skills from her PRW. Tr. at 71.

The ALJ described a third hypothetical individual of Plaintiff's vocational profile who could lift no more than 10 pounds occasionally and less than 10 pounds frequently; could stoop, twist, balance, crouch, kneel, crawl, and climb ramps and stairs no more than occasionally; and could not climb ladders, ropes, or scaffolds. *Id.* The VE testified the restrictions would not allow for the performance of Plaintiff's PRW. Tr. at 72. The ALJ asked the VE if the restrictions would allow for the performance of other jobs. *Id.* The VE identified semiskilled, sedentary jobs with transferable skills from Plaintiff's PRW that included information desk attendant, *DOT* number 237.367-022, with 572 jobs in South Carolina and 66,000 jobs nationally and seated service cashier, *DOT* number 211.462-026, with 870 jobs statewide and 52,000 jobs nationally. *Id.*

The ALJ described a fourth hypothetical individual who was limited to standing for less than two hours out of an eight-hour day; sitting for about four hours out of an eight-hour day; sitting for one hour at a time; standing for one hour at a time; was unable to climb ladders, ropes, or scaffolds; could rarely twist, crouch, climb stairs or ramps, or engage in other postural activities; could lift up to 20 pounds occasionally and 10 pounds frequently; would have frequent interference to attention and concentration for even simple work tasks; and would miss more than four days of work per month. Tr. at 73. The ALJ asked if there were any jobs that would accommodate those restrictions. *Id.* The VE

22

testified that there would be no jobs because of the impairment to attention and concentration, the fact that it was less than sedentary work, the total number of hours sitting and standing, and the expected absences on four or more days per month. Tr. at 73–74.

### ii.    March 5, 2013

At the hearing on March 5, 2013, VE Robert E. Brabham, Jr., appeared and testified. Tr. at 529–. The VE described Plaintiff's PRW as a cashier, *DOT* number 211.462-014, as light with a SVP of three; a cook, *DOT* number 313.374-014, as light with a SVP of three; and a waitress, *DOT* number 350.677-030, as light with a SVP of three. Tr. at 530–31.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who was restricted to no lifting or carrying over 25 pounds frequently and 50 pounds occasionally. Tr. at 531. The ALJ asked if that restriction would allow for the performance of Plaintiff's PRW. *Id.* The VE testified the hypothetical individual could perform Plaintiff's PRW. *Id.*

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who was limited to no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no more than occasional stooping, crawling, balancing, crouching, kneeling, or climbing of stairs or ramps; and no climbing of ladders, ropes, or scaffolds. Tr. at 531–32. He asked if those restrictions would allow for performance of Plaintiff's PRW. Tr. at 532. The VE testified that Plaintiff's PRW would allow for the restrictions in the second hypothetical. *Id.* The ALJ asked if Plaintiff's PRW could be performed if he were to add

to the second hypothetical a restriction to simple, repetitive tasks that did not require ongoing interaction with the general public. *Id.* The VE indicated the additional restrictions would eliminate all of Plaintiff's PRW, but would allow for light, unskilled work as a production inspector, *DOT* number 222.687-042, with 9,000 jobs in the local economy and in excess of 345,000 jobs nationally, and a garment folder, *DOT* number 789.687-066, with 1,000 positions in the local economy and in excess of 39,000 positions nationally. Tr. at 532–33.

For a third hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's vocational profile who was limited to lifting and carrying no more than 10 pounds occasionally and less than 10 pounds frequently; no standing or walking over an aggregate of two hours in an eight-hour workday; no more than occasional stooping, balancing, crouching, kneeling, or climbing of stairs or ramps; no crawling; and no climbing of ladders, ropes, or scaffolds. Tr. at 533. The VE testified the restrictions would not allow for performance of Plaintiff's PRW. *Id.* The ALJ added to the hypothetical a limitation to simple, routine tasks that did not require ongoing interaction with the general public. Tr. at 533–34. He asked the VE to identify jobs that would accommodate those restrictions. Tr. at 534. The VE identified sedentary, unskilled jobs as an assembler, *DOT* number 739.684-094, with 8,000 positions in the local economy and in excess of 350,000 positions nationally, and a machine tender, *DOT* number 731.685-014, with 7,000 positions in the local economy and in excess of 275,000 positions nationally. Tr. at 534.

The ALJ then referenced Dr. Dacus's statement and asked the VE to assume a hypothetical individual of Plaintiff's vocational profile who was limited to sitting four hours a day and standing or walking less than two hours a day; could walk one block without rest, sit for one hour at a time, and stand for one hour at a time; could rarely twist, stoop, crouch, and climb stairs; could never climb ladders ropes or scaffolds; and could lift 20 pounds occasionally and 10 pounds frequently. Tr. at 534–35. The VE testified there were no jobs that would allow for the restrictions in the hypothetical. Tr. at 535. He stated standing, sitting, and walking for a total of six hours out of an eight-hour day would allow for less than full-time gainful activity. *Id.*

The ALJ asked the VE if an individual could perform the jobs of assembler, machine tender, production inspector, and garment folder if she needed to alternate sitting and standing every hour. Tr. at 536. The VE stated the *DOT* did not address the sit-stand option, but, based on his experience, the jobs could be performed with no more than a 50 percent reduction in the number available. *Id.*

The ALJ asked if there would be jobs an individual could perform if she were unable to maintain concentration, persistence, and pace for 15 to 20 percent of each two-hour block of time. Tr. at 537. The VE stated that being off-task so frequently would exceed normal, allowable break time and would be inconsistent with gainful employment. *Id.*

The ALJ asked the VE to indicate how the jobs would be affected if the individual were predicted to be absent from work four or more days per month. *Id.* The VE testified

that was excessive in terms of normal, allowable absenteeism and would be inconsistent

with gainful activity. Tr. at 538.

2.      The ALJ's Findings

In his decision dated April 5, 2013, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 31, 2000 through her date last insured of December 31, 2005 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: lumbar spine degenerative disc disease with radiculopathy, obesity, and anxiety (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity of no lifting or carrying over 10 pounds occasionally and less than 10 pounds frequently; with no standing or walking over an aggregate of two hours in an eight-hour workday; with alternating between sitting and standing at the workstation every 60 minutes; with no more than occasional stooping, balancing, crouching, kneeling, and climbing of stairs and ramps; with no crawling, and no climbing of ladders, ropes, or scaffolds; limited to simple, routine tasks; and with no ongoing interaction with the general public.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on September 10, 1967, and was 38 years old, which is defined as a younger individual age 18–44, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 31, 2000, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(g)).

Tr. at 445–59.

## II. Discussion

Plaintiff alleges the Commissioner erred because the ALJ failed to accord controlling weight to the opinion of her treating physician. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

(1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157– 58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff raises only one objection to the Commissioner's decision, arguing that the ALJ erred in failing to accord controlling weight to Dr. Dacus's opinion. [ECF No. 13 at 2]. She maintains the ALJ failed to state "good reasons" under 20 C.F.R. § 404.1527(c)(2)[5] for rejecting the sitting limitation set forth in Dr. Dacus's opinion. *Id.* at 3, 13–14. Plaintiff further contends that Dr. Dacus's opinion was supported by the record. *Id.* at 5–7. Finally, Plaintiff requests that the undersigned reverse the Commissioner's decision and remand the claim for a calculation of benefits. *Id.* at 14.

---

[5] Plaintiff refers to 20 C.F.R. § 1527(d)(2), but her argument is more consistent with 20 C.F.R. § 1527(c)(2), which addresses the treatment relationship, as opposed to 20 C.F.R. § 404.1527(d)(2), which concerns opinions on issues reserved to the Commissioner.

The Commissioner argues the ALJ adequately assessed Dr. Dacus's opinion and provided a detailed and well-reasoned explanation for his decision to accord little weight to parts of it. [ECF No. 16 at 1–2]. The Commissioner also contends the record contains medical opinions that conflict with Dr. Dacus's opinion. *Id.* at 8–9. She further argues that substantial evidence supported the ALJ's findings. *Id.* at 17–18.

Judge Hendricks's order remanded the claim because the ALJ failed to adequately consider Dr. Dacus's opinion. *See* Tr. at 569–71. Judge Hendricks specifically found that the ALJ failed to address evidence that supported Dr. Dacus's opinion and failed to explain why he rejected the part of Dr. Dacus's opinion concerning Plaintiff's abilities to stand and walk, while accepting other parts of the opinion. *See* Tr. at 569, 571.

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, *quoting* 20 C.F.R. §§ 404.1527(a)(2). If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).

Pursuant to SSR 96-2p:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and

31

laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527.

SSA rules require that the ALJ carefully consider medical opinions on all issues. SSR 96-5p. Pursuant to 20 C.F.R. § 404.1527(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654. The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. § 404.1527(e)(2)(ii). In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

The ALJ indicated he "fully considered Dr. Dacus' answers on the September 2009 questionnaire and his letter of November 2012," but gave Dr. Dacus's "findings and conclusions limited weight." Tr. at 450. He pointed to what he perceived to be

inconsistencies between the limitations identified by Dr. Dacus. *Id.* Then, he stated the following:

> Dr. Dacus' conclusions that the claimant can only sit for about four hours, stand/walk for less than two hours, that she is unable to sustain employment in a competitive work environment, and that she is disabled from working in a competitive job environment from at least December 31, 2005 are not consistent with his own treatment notes, and the treatment notes from other treating physicians, prior to the date last insured, which have shown normal or nearly normal exams. Dr. Dacus' statements are also not consistent with diagnostic imaging, which has shown only limited abnormalities. Dr. Dacus' conclusions are also in direct contrast to the claimant's reported level of symptoms at office visits, as discussed below.

Tr. at 450–51.

The ALJ complied with Judge Hendricks's order remanding the claim. Upon remand, the ALJ exhaustively discussed the evidence, including that which supported Plaintiff's claim and that which undermined it. *See* Tr. at 446–51. He acknowledged that Plaintiff reported arthritis and trouble with her back on the July 2004 health profile, but noted that she did not complain to Dr. Dacus of back pain until more than eight months later. *See* Tr. at 451. The ALJ recognized that Plaintiff complained of back pain in May 2005 after being knocked over by a Great Dane, but did not complain of back pain again until January 2006, despite the fact that she was seen in Dr. Dacus's office for other concerns between May 2005 and January 2006. *See id.* The ALJ stated "[t]his long period in-between office visits in which the claimant did not seek treatment for any of her conditions certainly implies that none of her symptoms were particularly bothersome." Tr. at 446. He went on to note "[i]f the claimant's back pain prior to her date last insured was as severe and unrelenting as she has alleged in her disability application and in her testimony at the two hearings, it would seem likely that she would need to see her

33

treating physician on a frequent basis and she would probably request stronger pain medication—or at least a refill of what had been prescribed." Tr. at 447. The ALJ noted that the physical examinations performed by Dr. Dacus before and in the months after Plaintiff's DLI showed normal findings *See* Tr. at 447, 448, 450. He acknowledged that the March 2006 MRI indicated degenerative disc disease and disc space narrowing at L5-S1, but pointed out that the radiologist indicated it "was only <u>minimally effacing</u> the thecal sac and that it did not obviously exert traction or displace either proximal nerve root (emphasis added)." *See* Tr. at 451, *citing* Tr. at 297.

The ALJ specified he "fully considered" and accorded "limited weight" to Dr. Dacus's opinions. *See* Tr. at 450. The ALJ also thoroughly explained his reasons for rejecting Dr. Dacus's opinion regarding Plaintiff's functional abilities, indicating that Dr. Dacus's opinion regarding Plaintiff's abilities to lift and carry were inconsistent with his opinion about her abilities to sit, stand, and walk and that his opinion on her ability to stand and walk at one time was inconsistent with his opinion on her ability to stand and walk over the course of an eight-hour workday. *See id.* He further explained that Dr. Dacus's opinion was inconsistent with his treatment notes and with Dr. Bethea's examination and opinion, which showed Plaintiff to have fewer limitations in October 2012 than Dr. Dacus indicated she had prior to December 31, 2005. Tr. at 450–51.

The ALJ's conclusion that Dr. Dacus's opinion was not entitled to controlling weight was supported by substantial evidence. The ALJ discussed Plaintiff's infrequent complaints of back pain prior to her DLI, the minimal objective findings before and immediately after her DLI, and the conflicting opinion evidence offered by Dr. Bethea.

*See* Tr. at 450–51. He also discussed conflicts between Dr. Dacus's opinion and the daily activities Plaintiff reported in her testimony, on the forms completed for her DIB claim, and in Dr. Dacus's and Dr. Bethea's treatment notes. *See* Tr. at 449, 451, 452, 456. The ALJ adequately explained his reasons for concluding that Dr. Dacus's opinion was inconsistent with other evidence in the case record and lacked support in his own treatment notes and in the record as a whole.

The ALJ adequately considered all of the opinion evidence in accordance with the factors set forth in 20 C.F.R. § 404.1527 and SSR 96-2p. The record contains opinions from Dr. Dacus, Dr. Bethea, and the state agency consultants. *See* Tr. 345–53, 354–55, 356–69, 370–71, 372–74, 694–99, 790. The ALJ acknowledged the examining and treatment relationship Plaintiff had with Dr. Dacus, but accorded "limited weight" to Dr. Dacus's opinion because it was internally inconsistent, not supported by his treatment notes, and inconsistent with the record as a whole. *See* Tr. at 450–52. Although the ALJ acknowledged Dr. Bethea was not one of Plaintiff's treating physicians, he accorded "significant weight" to Dr. Bethea's opinion because Dr. Bethea performed an examination; his opinion was supported by a lack of abnormal findings upon examination; his opinion was consistent with the objective evidence in the record; and, as a board-certified orthopedic surgeon, he was a medical specialist. Tr. at 452. The ALJ accorded "significant weight" to the state agency consultants' "overall conclusion that the claimant is capable of sustained work," which he stated was "supported by the objective medical evidence." Tr. at 457. However, the ALJ rejected their specific findings, determining that Plaintiff was restricted to a limited range of sedentary work and to

35

simple, routine tasks with no ongoing interaction with the general public. *See id.* In light of the foregoing, the undersigned concludes that the ALJ considered all of the statutory factors set forth for evaluating opinion evidence, specified the weight given to all opinions of record, and explained his reasons for according such weight.

The undersigned finds that the ALJ's decision was supported by substantial evidence. The ALJ adequately considered and discussed all evidence prior to and following Plaintiff's DLI, including all opinion evidence. He wrote in his decision "[t]here is no question that claimant had lumbar spine degenerative disc disease with radiculopathy prior to her date last insured," but concluded "the medical evidence simply does not support Dr. Dacus' conclusions of disability and an inability to work." *Id.* The ALJ found that, prior to her DLI, Plaintiff had severe impairments that significantly limited her ability to perform most jobs, including those she performed in the past. *See* Tr. at 455, 457. However, he determined that there remained jobs that Plaintiff was able to perform prior to her DLI. *See* Tr. at 458. The ALJ properly supported his decision to reject the evidence Plaintiff presented to establish she was unable to perform other work. Therefore, the undersigned finds that substantial evidence supported the ALJ's decision.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

January 13, 2015                           Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge